<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|                              |     |                                    |
|------------------------------|-----|------------------------------------|
| BROADCOM CORPORATION,        | :   |                                    |
|                              | :   | CIVIL ACTION NO. 05-3350 (MLC)     |
|    Plaintiff, | :   |                                    |
|                              | :   | **MEMORANDUM OPINION**             |
|    v.         | :   |                                    |
|                              | :   |                                    |
| QUALCOMM INCORPORATED,       | :   |                                    |
|                              | :   |                                    |
|    Defendant. | :   |                                    |
|                              | :   |                                    |
|                              | :   |                                    |

<u>**COOPER, District Judge**</u>

The defendant, Qualcomm Incorporated ("Qualcomm"), moves pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss the amended complaint. The Court, for the reasons stated herein, will grant the motion.

<u>**BACKGROUND**</u>

The plaintiff, Broadcom Corporation ("Broadcom"), is a California corporation based in Irvine, California. (Am. Compl., at 1.) Qualcomm is a Delaware corporation based in San Diego, California. (Id.) Broadcom supplies semiconductors for wired and wireless broadband communications. (Id. at 11.) Qualcomm develops and implements digital wireless communications technologies. (Def. Br., at 6.) This dispute surrounds Qualcomm's alleged "illegal and anti-competitive conduct in the markets for the technology and chipsets that operate cell phones employing Wideband Code Division Multiple Access ("WCDMA"), a third generation ("3G") technology that is implemented through a

mobile telephone standard known as the Universal Mobile Telephone System [UMTS]."  (Am. Compl., at 1.)

Broadcom brought an action against Qualcomm on July 1, 2005. It filed an amended complaint on September 19, 2005.  (Dkt. entry no. 14.)  Qualcomm now moves to dismiss the amended complaint. The Court has read the papers in support of and opposition to the motion, and heard oral argument on June 26, 2006.

## I.  Historical Facts

Cell phones contain multiple components that enable users to send and receive phone calls and other data.  (Am. Compl., at 12.) A cell phone's "core ability to communicate with the wireless system" is enabled by one or more computer chipsets contained in the phone.  (Id.)  Various companies manufacture such chipsets, and the phones into which they are incorporated.  To function properly, however, cell phones and chipsets made by different manufacturers must be capable of interfacing with each other. (Id. at 13.)  To ensure the interoperability of different cell phones, the wireless industry works with several standards development organizations ("SDOs") to develop wireless communications standards.  (Id.)  The standards that are established may be comprised of patented technology.  (Id. at 14.) An SDO may require a patent-holder to agree to license the patent on fair, reasonable, and non-discriminatory ("FRAND") terms before it agrees to incorporate the patent into the standard.  (Id.)

2

This requirement is designed to prevent a patent-holder from acquiring an unfair advantage when a patent is incorporated into the standard.

Cell phone technology has developed through several generations.  (Id. at 15.)  The first generation ("1G") of cell phones were based on analog technology.  (Id.)  The second generation ("2G") is based on digital technology.  The primary 2G standard technologies are (1) Global System for Mobility ("GSM") and (2) Code Division Multiple Access ("CDMA").  (Id.)  These two technologies are incompatible.  (Id.)  Carriers such as Cingular Wireless and T-Mobile use GSM, while Verizon Wireless and Sprint use CDMA.  (Id.)

Qualcomm holds more than 1,400 patents related to CDMA technology and components.  (Id. at 21.)  Many of the patents are essential for CDMA systems and chipsets.  (Id.)  Broadcom asserts that (1) Qualcomm used its power over CDMA technology to obtain and protect monopoly power in the CDMA chipset markets, and (2) this monopoly is due to exclusionary and anticompetitive conduct, and not business acumen.  (Id. at 21-23.)  For example, Broadcom alleges that Qualcomm (1) has threatened cell phone manufacturers with the loss of certain benefits if they purchase chipsets from a Qualcomm competitor, (2) reduces royalty rates when a company obtaining a patent license from Qualcomm agrees to purchase Qualcomm chipsets exclusively, and (3) has manipulated the SDOs

to ensure that the third generation ("3G") CDMA standard is in a form Qualcomm prefers.  (Id. at 24-26.)  Broadcom asserts that Qualcomm has used its power to raise prices and restrict output. (Id. at 23.)

**II.  The Third Generation of Cell Phone Technology**

Companies are developing wireless technologies.  (Id. at 16.) The 3G CDMA technology is known as CDMA2000-1xEVDO ("3G CDMA"). (Id.)  The 3G GSM technology is WCDMA implemented through the UMTS standard.  CDMA-based systems and WCDMA-based systems are neither compatible, nor interchangeable.  (Id. at 3.)  To transition from CDMA to UMTS, or GSM to 3G CDMA would be costly. (Id. at 3.)  Wireless service carriers operating CDMA-based networks, therefore, will transition to 3G CDMA technology, and carriers operating GSM-based networks will transition to UMTS technology through WCDMA.  (Id.)

Qualcomm holds patents for WCDMA technology that are essential to the UMTS standard.  (Id. at 2.)  Broadcom asserts that the relevant SDO only adopted the UMTS standard after Qualcomm agreed to license its WCDMA technology on FRAND terms. (Id.)  Broadcom has developed UMTS chipsets that would compete with the UMTS chipsets manufactured by Qualcomm.  (Id.)  But Qualcomm controls the rights to the patents necessary for Broadcom to manufacture UMTS chipsets.  Broadcom sought a license from Qualcomm for the use of the patents essential to WCDMA

4

technology and the UMTS standard.  (Id. at 29.)  Broadcom asserts that Qualcomm has refused to license the patents on FRAND terms, in violation of its commitment to the SDO.  (Id. at 4, 29.)  It alleges that Qualcomm has used unlawful and discriminatory licensing practices to (1) undermine competition, (2) monopolize the WCDMA technology market, and (3) attempt to monopolize the market for UMTS chipsets.  (Id. at 4, 27.)

### III. Qualcomm's Alleged Anticompetitive Conduct

Broadcom asserts that Qualcomm is engaging in the same type of anticompetitive conduct that it used to monopolize the CDMA technology and chipset market to monopolize the UMTS market. (Id. at 2.)  The amended complaint contains many allegations of anticompetitive conduct on the part of Qualcomm.  The alleged conduct, however, can be summarized and grouped into three categories; Qualcomm's acts of (1) refusing to license its WCDMA technology on FRAND terms, (2) tying the sale of its UMTS chipsets to the license for its WCDMA patents, and (3) offering discounts and inducements to buyers agreeing not to use the chipsets of a Qualcomm competitor.  (Id. at 5-8, 30-36.)[1] Examples of Qualcomm's alleged refusal to license its patents on FRAND terms include its demands for (1) royalties on unpatented components, (2) non-

---

[1] Broadcom also alleges that Qualcomm's acquisition of Flarion Technologies ("Flarion") will substantially lessen competition and extend Qualcomm's monopoly.  (Am. Compl., at 8, 38.)  The Court will discuss the facts and claims related to the Flarion acquisition separately, infra.  See DISCUSSION II.C.

reciprocal patent rights, (3) double-royalties, (4) excessive
royalty rates, and (5) anticompetitive information exchanges,
from potential UMTS licensees. (Id. at 30-34.)  As to the alleged
tying arrangement, Broadcom alleges that Qualcomm requires WCDMA
licensees to pay multi-million dollar licensing fees unless they
agree to purchase Qualcomm chipsets exclusively.  (Id. at 35.)
Similar to the alleged tying arrangement, Broadcom asserts that
Qualcomm offers discounts, marketing incentives, and other rewards
conditioned on the use of only Qualcomm chipsets.  (Id. at 36.)
The incentives (1) "can amount to tens of millions of dollars,"
(2) "substantially raise[] competitors' costs of selling and
marketing UMTS chipsets, and (3) "strongly discourage[] chipset
buyers from dealing with Qualcomm's competitors."  (Id. at 36-37.)

**IV.  The Amended Complaint**

The amended complaint asserts thirteen causes of action
against Qualcomm based on the three categories of conduct
discussed supra.  The first eight claims are federal antitrust
claims based on the Sherman Antitrust Act ("Sherman Act), and the
Clayton Act.  The remaining claims assert various state and common
law causes of action.  The federal claims can be divided into
three categories.  Counts 1, 2, and 7 assert violations of Section
2 of the Sherman Act including (1) monopolization of the WCDMA
technology markets, (2) attempted monopolization of the UMTS
chipset market, and (3) maintenance of a monopoly in the market

for 3G CDMA technology and 3G CDMA chipsets.  (Id. at 45-47, 51.)
Counts 3 through 6 assert violations of Section 1 of the Sherman
Act and Section 3 of the Clayton Act, specifically that Qualcomm
engaged in exclusive dealing and unlawfully tied the sale of its
UMTS chipsets to licenses for its WCDMA technology.  (Id. at 47-
51.)  Count 8 alleges that Qualcomm's acquisition, holding, and
use of Flarion violates Section 7 of the Clayton Act.  (Id. at 52.)

The state and common law claims assert causes of action for
(1) violation of the New Jersey Antitrust Act and other unfair
competition and trade practices laws, (2) tortious interference
with prospective economic advantage, (3) breach of contract, (4)
promissory estoppel, and (5) fraud.  (Id. at 52-57.)

## DISCUSSION

Qualcomm argues that the amended complaint should be
dismissed for failure to state claims upon which relief can be
granted because (1) its alleged "monopoly power" is derived from
the rights that accompany lawfully-obtained patents, (2) Broadcom
has not suffered an antitrust injury in the UMTS chipset market,
(3) there is no dangerous probability that Qualcomm will succeed
in monopolizing the UMTS chipset market, (4) Broadcom does not
allege that Qualcomm's "exclusive dealing" forecloses a
substantial share of the market, (5) Qualcomm does not refuse to
license its WCDMA technology without the purchase of Qualcomm
UMTS chipsets, (6) Broadcom does not have standing to bring

7

claims related to the 3G CDMA market or to challenge the Flarion acquisition, and (7) Broadcom has not sufficiently pled its state and common law claims.  (Def. Br., at 11, 23, 26, 33, 34, 37.)

Broadcom argues it has pled claims upon which relief can be granted because (1) Qualcomm willfully acquired monopoly power by inducing the SDO to adopt a standard that incorporated its patents and promising to license its patents on FRAND terms, (2) it has alleged that Qualcomm is using its monopoly power in the WCDMA technology market to drive competitors out of the UMTS chipset market, (3) Qualcomm's provision of discounts and incentives to patent licensees agreeing to buy Qualcomm UMTS chipsets constitutes unlawful tying and exclusive dealing, (4) it has standing to challenge Qualcomm's conduct in the 3G CDMA market and its acquisition of Flarion, and (5) its state and common law claims are well-pled.  (Pl. Br., at 11, 19, 27, 34, 38, 41.)

## I.   Motion to Dismiss Standard

A complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  The Court must accept as true all of the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff.  Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).  "Dismissal of claims under Rule 12(b)(6) is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim upon which relief may be granted."  Jakomas v. McFalls, 229 F.Supp.2d 412, 419 (W.D. Pa. 2002).

The Court liberally construes antitrust complaints. Commonwealth v. Zimmerman, 836 F.2d 173, 179 (3d Cir. 1988).  The Court views the complaint as a whole and bases rulings "not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable."  City of Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 263 (3d Cir. 1998). Antitrust complaints, however, are not exempt from the Federal Rules.  Zimmerman, 836 F.2d at 179.  "A mere allegation that defendants violated the antitrust laws as to a particular plaintiff and a commodity no more complies with Rule 8 than an allegation that a defendant made an undescribed contract with the plaintiff and breached it, or that a defendant owns a car and injured plaintiff by driving it negligently."  Id.  The Court assumes that the plaintiff can prove the facts alleged in the complaint, but does not assume that the plaintiff can prove facts that are not alleged, or that the defendants have violated the antitrust laws in ways that have not been alleged.  Id. at 180. "It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint."  Id. at 181. "When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."  Id. at 182.

## II.  Analysis

### A.   Sherman Act Claims - Counts 1, 2, and 7

Broadcom alleges that Qualcomm has (1) monopolized the market for WCDMA technology, (2) attempted to monopolize the market for UMTS chipsets, and (3) maintained a monopoly in the markets for 3G CDMA technology and 3G CDMA chipsets, in violation of Section 2 of the Sherman Act.  (Am. Compl., at 45-46, 51.)

#### 1.   Elements of the Claims

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade" is guilty of an offense and subject to criminal penalties.  15 U.S.C. § 2.  To violate Section 2, a defendant must engage in illegal conduct "to foreclose competition, gain a competitive advantage, or to destroy a competitor."  Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 482-83 (1992). The offense of monopoly has two elements; (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.  United States v. Grinnell, 384 U.S. 563, 570-71 (1966); SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1062 (3d Cir. 1978).

10

Monopoly power requires something greater than market power. United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005).  Monopoly power is the power to control prices or exclude competition.  Grinnell, 384 U.S. at 571; Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1353 (Fed Cir. 1999).  The mere possession of monopoly power and the charging of monopoly prices is not unlawful.  Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398, 408 (2004).  The possession of monopoly power is unlawful when it is accompanied by anticompetitive conduct.  Id.; see also Kodak, 504 U.S. at 481  (noting that monopoly power under Section 2 requires more than market power). Anticompetitive conduct is conduct whose purpose is to acquire or preserve the power to control prices or exclude competition.  Id. "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits.  LePage's Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003).

A plaintiff, to support a claim for attempted monopolization, must show that the defendant (1) had a specific intent to monopolize the relevant market, (2) engaged in anticompetitive or exclusionary conduct, and (3) possesses sufficient market power to come dangerously close to success.  Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir. 1992); see Townshend v. Rockwell Int'l Corp., No. 99-0400, 2000 WL 433505, at *10 (N.D. Cal. March 28, 2000) (noting a plaintiff must show a defendant's specific

11

intent to control prices or destroy competition in the relevant
market).  Specific intent requires more than an intention to
prevail over rivals or improve market position.  <u>Pa. Dental Ass'n
v. Med. Serv. Ass'n of Pa.</u>, 745 F.2d 248, 260 (3d Cir. 1984).  A
dangerous probability of success may exist when a company has a
significant market share at the time that it engages in the
alleged anticompetitive conduct.  <u>Barr Labs., Inc.</u>, 978 F.2d at
112.  Other factors that are relevant to the probability of
success are the strength of the competition, probable development
of the industry, barriers to entry, the nature of the
anticompetitive conduct, and the elasticity of consumer demand.
<u>Id.</u>  It is not necessary for the plaintiff to show that the
defendant succeeded in the attempt to monopolize to maintain a
claim for attempted monopolization.  <u>Lorain Journal Co. v. United
States</u>, 342 U.S. 143, 153 (1951).

### 2.  Patents, SDOs, and the Antitrust Laws

To state a claim for monopolization or attempted
monopolization Broadcom must allege, <u>inter</u> <u>alia</u>, that Qualcomm
engaged in exclusionary or anticompetitive conduct.  Count 1
alleges that Qualcomm's anticompetitive conduct as to the
monopolization of the WCDMA technology includes (1) inducing the
relevant SDO to adopt a 3G standard that incorporates Qualcomm's
patents by promising to license the patents on FRAND terms, and
(2) refusing to honor that promise.  (Am. Compl., at 45.)  As to

12

Count 2, the attempted monopolization of the UMTS chipsets, Broadcom alleges Qualcomm (1) refuses to honor its FRAND licensing commitment, (2) refuses to provide Broadcom a license on FRAND terms, and (3) provides various discounts and incentives to Qualcomm patent licensees who also purchase Qualcomm chipsets. (Id. at 46.)  Count 7 alleges that "[b]y acts, practices, and conduct described above [in the amended complaint] Qualcomm is unlawfully maintaining its monopoly in the 3G CDMA technology markets and 3G CDMA chipset market."  (Id. at 51.)

Whether Qualcomm's conduct is anticompetitive and contrary to the antitrust laws depends on the context of the situation. LePage's Inc., 324 F.3d at 152.  The Court, considering the facts alleged here, finds that Qualcomm's alleged conduct does not support claims for monopolization or attempted monopolization. "The Sherman Act was designed to prohibit significant restraints of trade rather than to proscribe all unseemly business practices."  Tunis Bros. Co. Inc. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1992) (internal quotes and cite omitted).  The Court has evaluated the nature of Qualcomm's conduct with an awareness of (1) the rights Qualcomm possesses as a competitor, (2) the relationship between patent law and antitrust law, and (3) the role and purpose of SDOs.  See Verizon, 540 U.S. at 412 ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue").

13

Qualcomm's anticompetitive conduct, as alleged by Broadcom, has taken various forms.  Considered as a whole, the basic allegation is that Qualcomm's conduct amounts to a refusal to deal fairly in the WCDMA technology market, which affects the UMTS chipset market and CDMA markets.  But the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell."  United States v. Colgate, 250 U.S. 300, 307 (1919); see Intergraph Corp., 195 F.3d at 1357 ("antitrust laws do not compel a company to do business with anyone-customer, supplier, or competitor").  The right to refuse to deal with other companies, however, is not unqualified, and under certain circumstances can be considered anticompetitive conduct.  Verizon, 540 U.S. at 408; see, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985) (determining that ski facility's refusal to participate in a multi-day lift ticket offer with other ski facilities violated Section 2 of the Sherman Act).  But the Supreme Court has "been very cautious in recognizing such exceptions [to the right to refuse to deal], because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."  Verizon, 540 U.S. at 408.

In Verizon, the Court (1) affirmed the dismissal of the complaint, and (2) declined to recognize a cause of action under Section 2 based on Verizon's deficient assistance to its rivals. Id.  Verizon provided local telephone service to customers in New York.  Following regulatory changes designed to increase competition, Verizon took advantage of the opportunity to enter the long distance telephone market.  In order to do this, Verizon had to agree to provide other carriers (its competitors) with access to certain elements of its network, including operations support.  A Verizon competitor would send an order for service to Verizon, Verizon would undertake steps to fill the order, and send a confirmation to the competitor requesting service.  The plaintiff alleged that (1) Verizon filled the orders for its own service before it filled its competitors' orders for service, and (2) this was done to discourage the competitors' customers from continuing their patronage.  Id. at 402-03.

The Court determined that (1) Verizon's alleged insufficient service to its rivals was not recognized as an antitrust claim under the Court's refusal-to-deal precedents, and (2) traditional antitrust principles did not justify adding such conduct to the "few existing exceptions from the proposition that there is no duty to aid competitors." Id. at 410-11.  The Court was concerned that Verizon's alleged anticompetitive conduct was "beyond the practical ability of a judicial tribunal to control."  Id. at 414

15

(internal quotes and cite omitted).  "No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise.  The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." Id. at 415 (internal quotes and cite omitted) ("[a]n antitrust court is unlikely to be an effective day-to-day enforcer" of the terms and conditions upon which companies deal with one another).

This Court shares the Supreme Court's concern that reviewing and supervising the terms upon which Qualcomm licenses its patents, and offers to sell its UMTS chipsets may be beyond the effective control of the Court under the antitrust laws.  See Verizon, 540 U.S. at 415-16 (noting that the Sherman Act "does not give judges carte blanche to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition"); Intergraph Corp., 195 F.3d at 1364. The Court will not sustain causes of action that seek oversight of the business transactions of two competing companies.  "An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare"  Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996).  But Qualcomm's alleged conduct requires additional scrutiny because, unlike Verizon's services, the

technology at issue is patented and essential to an industry standard.

The Patent Act provides patent-holders with the right to refuse to license their patents to others.  See 35 U.S.C. § 271(d).  The antitrust laws do not negate this right.  In re Indep. Serv. Orgs., 203 F.3d 1322, 1325 (Fed Cir. 2000).  A patent alone does not confer market power.  Ill. Tool Works Inc. v. Indep. Ink, Inc., 126 S.Ct. 1281, 1293 (2006); In re Indep, Serv. Orgs., 203 F.3d at 1325.  "The commercial advantage gained by new technology and its statutory protection by patent do not convert the possessor thereof into a prohibited monopolist."  Abbott Labs. v. Brennan, 952 F.2d 1346, 1354 (Fed. Cir. 1991).  A patentee has a legal monopoly over an invention.  Antitrust liability cannot flow from conduct that is permissible under the patent laws.  Sheet Metal Duct v. Lindab, Inc., 55 U.S.P.Q.2d 1480, 1486-87 (E.D. Pa. 2000); Hoffman-La Roche, Inc. v. Genpharm, Inc., 50 F.Supp.2d 367, 378 (D.N.J. 1999); see, e.g., Rockwell, No. 99-0400, 2000 WL 433505, at *8 ("patent owner's pursuit of optimum royalty income is not an act in restraint of trade which violates the antitrust laws").  Qualcomm, therefore, does not violate the antitrust laws by merely holding patents essential to the UMTS standard.

"Intellectual property rights [however] do not confer a privilege to violate the antitrust laws."  In re Indep. Serv. Orgs., 203 F.3d at 1325.  Due consideration must be given to the "exclusivity that inheres in the patent grant when determining

17

whether a patentee has monopolized or attempted to monopolize a market.  Abbott Labs., 952 F.2d at 1354-55.

Courts have not extended antitrust liability to unilateral refusals to sell or license patents.  In re Indep. Serv. Orgs., 203 F.3d. at 1326 (manufacturer's refusal to license or sell patented parts to independent service providers that repaired the manufacturer's machines did not violate the antitrust laws). Here, however, Broadcom alleges that Qualcomm promised the SDO it would license its patents on FRAND terms.  The existence of SDOs in the cell phone industry draws additional antitrust scrutiny to Qualcomm's alleged conduct.  Rambus Inc. v. Infineon Tech. AG, 330 F.Supp.2d 679, 696 (E.D. Va. 2004) ("[p]rivate standard-setting associations have traditionally been objects of antitrust scrutiny").  "Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products." Allied Tube & Conduit Corp. v. Indian Head Inc., 486 U.S. 492, 500 (1988).  Standards and product uniformity, however, have procompetitive advantages. Allied Tube, 486 U.S. at 501.  SDOs are tolerated to promote such uniformity, and to enable interoperability, but they also provide the opportunity for anticompetitive activity.  Rambus Inc., 330 F.Supp.2d at 696.  They afford an industry participant acting either alone, or in concert with other participants, to exert influence over the rest of the industry.  Rambus, 330 F.Supp.2d

18

at 696.  It is alleged that Qualcomm exerted such influence by refusing to honor its FRAND promise.  To obtain a license to Qualcomm's patents Broadcom alleges that Qualcomm demands excessive royalties, and links patent licenses to the purchase of UMTS chipsets.  Such practices allegedly enabled Qualcomm to (1) acquire a monopoly in the WCDMA technology market (Count 1), (2) maintain a monopoly in the 3G CDMA technology market and 3G CDMA chipset market (Count 7), and (3) attempt to monopolize the UMTS chipset market (Count 2).

### 3.  Application

Broadcom's allegations fall short of asserting claims pursuant to Section 2 of the Sherman Act.  To maintain the claims, Qualcomm's conduct must be anticompetitive.  It must affect prices, quantity, or quality of goods and services, not just Broadcom's own welfare.  Mathews, 87 F.3d at 641.  The conduct must be directed toward competitors and intended to injure competition.  See Intergraph Corp., 195 F.3d at 1353. Reading the amended complaint in the light most favorable to Broadcom, the facts alleged do not raise such inferences.

To maintain a claim against Qualcomm for monopolization of the WCDMA technology market, either the incorporation of Qualcomm's patents into the standard, or Qualcomm's alleged inducement of the SDO and refusal to license its patents on FRAND terms, must have injured competition in the WCDMA technology

19

market.  For the purposes of this motion, the Court assumes that there is no competition in the WCDMA technology market.  This lack of injury to competition, however, is not the result of Qualcomm's conduct, it is the natural consequence of the standard-setting process.  As recognized in Allied Tube, agreement on a product standard is an agreement to manufacture a certain type of product, and therefore not manufacture other products.  See Allied Tube, 486 U.S. at 500.  It is, essentially, an agreement to eliminate competition.  The agreement promotes interoperability, but at the expense of competition.

Qualcomm has a legal monopoly over the technology claimed in its patents.  The incorporation of Qualcomm's WCDMA patents into the UMTS standard does not make Qualcomm an unlawful monopolist in the WCDMA technology market.  To conclude otherwise would subject every firm with patents incorporated into an industry standard to antitrust liability, and eliminate the procompetitive benefits a SDO is designed to facilitate.  When an SDO decides to incorporate one company's patented technology into a standard, the company holding the incorporated patents will be in a position to control that technology's distribution.  Qualcomm's "power" to control the licensing of its patents is derived from the rights it enjoys as a patent-holder.  The adoption of an industry standard neither diminishes nor augments this exclusionary right.  Townshend, No. 99-0400, 2000 WL 433505, at *12 ("[t]he adoption of an industry

20

standard . . . does not confer any power to exclude that exceeds
the exclusionary power to which a patent holder is [] entitled").
Qualcomm, therefore, stands on the same footing as the other
companies with patents incorporated in the WCDMA standard.[2]

The Court recognizes that Qualcomm's alleged "inducement" of
the SDO may be considered anticompetitive conduct in the sense
that a false promise biased the SDO in Qualcomm's favor, to the
detriment of those patent-holders competing to have their patents
incorporated into the standard.[3]  The elimination of competition
in the WCDMA technology market, however, would result regardless
of how the SDO decided which patents would comprise the standard.
While Qualcomm's behavior may have influenced how the SDO would
eliminate competition, it is the SDO's decision to set a standard
for WCDMA technology, not Qualcomm's "inducement," that results
in the absence of competing WCDMA technologies.  Qualcomm's
alleged inducement by false promise may give rise to a cause of
action based on another legal theory, but they do not provide an
antitrust cause of action.  The terms upon which Qualcomm chooses
to license its patents since their incorporation into the

---

[2] "Other parties with patents that they have declared as
essential to implementing WCDMA includ[e] Nokia, Ericcson,
InterDigital, and Samsung."  (Am. Compl., at 33.)

[3] Broadcom does not allege that it holds patents that were
competing to be included in the WCDMA technology standard.
Broadcom, however, alleges that it needs a license to Qualcomm's
patents to manufacture UMTS chipsets.

standard may be considered restrictive and unfair to companies, such as Broadcom, desiring such licenses, but such terms cannot eliminate competition in a technology market that is devoid of competition by virtue of a standard.

The conduct with respect to Count 2 also fails to allege anticompetitive conduct sufficient to maintain a claim for the attempted monopolization of the UMTS chipset market.  Broadcom characterizes Count 2 as an allegation that Qualcomm is leveraging its power in the WCDMA technology market to gain control of the UMTS chipset market.  (Tr. at 65, Pl. Br., at 23, Am. Compl., at 2.)  It alleges, <u>inter</u> <u>alia</u>, that Qualcomm's refusal to license its patents on FRAND terms, and provision of discounts and other incentives to patent licensees purchasing Qualcomm chipsets, create a dangerous probability that Qualcomm will succeed in monopolizing the UMTS chipset market.  (<u>See</u> Am. Compl., at 46.)

The allegations and the amended complaint read as whole do not support an inference that competition in the UMTS chipset market is, or will be injured by Qualcomm's licensing practices. Broadcom alleges that it is unable to compete in the UMTS chipset market because it has not obtained a license to Qualcomm's essential patents.  Qualcomm, however, has not refused to license its patents to Broadcom.  Broadcom has refused the licensing terms proposed by Qualcomm.  Broadcom is only one potential competitor.  "Others have apparently accepted the license that

Qualcomm imposed." (Pl. Br., at 23.)  The amended complaint does not indicate how competition in the UMTS chipset market as a whole is being excluded.  It does not provide information on the composition or dynamics of the market for UMTS chipsets to enable the Court to infer that Qualcomm's conduct is anticompetitive. For example, the amended complaint does not indicate (1) the number of companies manufacturing and selling UMTS chipsets, (2) the relevant market shares of those companies, (3) whether other companies have been unable to obtain patent licenses from Qualcomm, or (4) what companies have entered or left the market. It states "various firms in the industry develop and manufacture these chipsets." (Am. Compl., at 13.)

The amended complaint does allege that the UMTS chipset market is experiencing rapid growth, and that Qualcomm (1) has signed agreements with 26 cell phone manufacturers, and (2) expects 77% sales growth. (Am. Compl., at 37.)  But these assertions do not illustrate the degree of competition in the UMTS chipset market, and how it will be or has been injured by Qualcomm's licensing practices.  The allegations of anticompetitive injury are broad and non-specific.  For example, Broadcom alleges:

> there is a dangerous probability that Qualcomm will exclude Broadcom and others from the UMTS chipset market and obtain monopoly power.  This conduct will harm competition in the UMTS chipset market.
>
> As a cumulative consequence of this and Qualcomm's other anticompetitive conduct, Qualcomm has undermined the

> ability of independent UMTS chipset manufacturers such as Broadcom to compete against Qualcomm in the UMTS chipset market.
>
> This and Qualcomm's other conduct have undermined competition for UMTS chipsets.
>
> The effect . . . is to prevent competition to the detriment of both would-be competitors such as Broadcom and consumers.
>
> Qualcomm's royalty rate discrimination . . . has the effect of harming, competition in the UMTS chipset market.
>
> Qualcomm has also foreclosed competition for UMTS chipsets through the use of discounts, marketing incentives, and other rewards.

(Id. at ¶¶ 21, 94, 98, 102, 105, 110.)

The absence of details as to the size of the UMTS market, who participates in the UMTS market, and Qualcomm's share of that market shows that (1) the amended complaint lacks sufficient allegations of anticompetitive conduct to sustain a claim for attempted monopolization, and (2) Broadcom has not sufficiently illustrated that Qualcomm has a dangerous probability of succeeding in monopolizing the UMTS market.

The Court recognizes that Qualcomm, as holder of patents essential to the UMTS standard, and Broadcom as the entity seeking access to the patents do not approach license negotiations as equals. However, "the elements of Sherman Act violation do not inhere in failed negotiations." Intergraph Corp., 195 F.3d at 1361. "It is not the judicial role to re-adjust the risks in high-stakes commercial dealings." Id. at 1362. The Court recognizes that as alleged by Broadcom, Qualcomm

24

agreed to license its patents on FRAND terms, and is now refusing to honor this promise.  While this "agreement" may give rise to liability based on another theory such as breach of contract, it does not give rise to antitrust liability.[4]  "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.  The law directs itself not against conduct which is competitive, even severely so, *but against conduct which unfairly tends to destroy competition itself*."  Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 458 (1993) (emphasis in original).

Qualcomm's conduct may engender ill-will, but it must have threatened injury to competition — not just competitors — to give rise to antitrust liability for attempted monopolization.  See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993) (stating act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws).  While the technology licensing terms offered by Qualcomm may be restrictive and costly to Broadcom, that the terms impose a burden on companies wishing to compete with Qualcomm in the UMTS chipset market does not make such conduct anticompetitive for purposes of the antitrust laws.

_____

[4] Count 11 of the amended complaint asserts a claim for breach of contract based upon Qualcomm's conduct in dealing with the SDO.  For the reasons discussed infra, the Court expresses no opinion as to the merits of this claim.

Count 7 also fails to state a claim upon which relief can be granted.  It alleges that Qualcomm has maintained a monopoly in the market for 3G CDMA chipsets and 3G CDMA technology.  Unlawful maintenance of a monopoly occurs when a defendant engages in anticompetitive conduct that "reasonably appears to be a significant contribution to maintaining monopoly power." Dentsply, 399 F.3d at 187.  Exclusionary practices are not sufficient.  Id.  Broadcom alleges that Qualcomm has monopoly power in the markets for 3G CDMA technology markets because the 3G CDMA standard cannot be practiced without licenses to Qualcomm's patents.  (Am. Compl., at 21, 23.)  As in the WCDMA technology market, Qualcomm's possession of patents essential to 3G CDMA technology does not make it an unlawful monopolist in the 3G CDMA technology market.  Similar to the WCDMA technology market, there is no competition in the 3G CDMA technology market because a standard has been set.  Thus, Qualcomm's alleged conduct is not anticompetitive for purposes of Section 2 of ths Sherman Act.  Qualcomm's ability to restrict access to patented technology inheres in its patent rights.  The fact that the ability of other companies to compete in the 3G CDMA chipset market depends on acquiring a patent license from Qualcomm is a result of the patent system.  Count 7, therefore, does not state a claim for unlawful monopoly in the 3G CDMA technology market.

Broadcom also cannot demonstrate a claim for maintaining a monopoly in the 3G CDMA chipset market.  The amended complaint

26

does not sufficiently allege that Qualcomm's conduct has
anticompetitive effects in the market for 3G CDMA chipsets.
Qualcomm's alleged anticompetitive conduct in the 3G CDMA chipset
market includes (1) using its power over the CDMA chipset supply
to discipline customers and exclude competitors, (2) reducing
royalties when a licensee agrees to buy Qualcomm chipsets, and
(3) manipulating the SDO to ensure the 3G standard takes a form
Qualcomm prefers.  (Am. Compl., at 24-26.)  That Qualcomm chipset
supplies have not kept pace with demand, however, injures the cell
phone manufacturers purchasing chipsets for use in their phones.
The chipset supply shortage does not directly injure those
seeking to compete with Qualcomm in the manufacture and sale of
UMTS chipsets.  Reducing royalties to those licensees purchasing
Qualcomm chipsets may entice and provide an incentive for
licensees to purchase Qualcomm chipsets, but such an incentive is
not anticompetitive conduct for purposes of the antitrust laws.
Ensuring that the 3G standard takes a form Qualcomm prefers may
provide Qualcomm with a competitive advantage, however, it alone
does not indicate how other chipset manufacturers are foreclosed
from competing in the market for 3G CDMA chipsets.

The Court also notes that similar to the deficiencies in
Count 2, there are not enough details as to the composition of
the 3G CDMA chipset market to conclude competition is injured.
While the amended complaint states that Qualcomm has shipped more

than 400 million chipsets, and sells approximately 90% of each CDMA chipset generation, those facts alone do not indicate that Qualcomm is an unlawful monopolist in that market.  (Am. Compl., at 21.)  The amended complaint also states that several firms have entered the 3G CDMA market, but have not "achieved commercial success," and at least one firm has exited.  (Id. at 23.)  While entry into, and an exit from the market are relevant to a claim for monopolization, such facts are not enough to conclude Qualcomm's conduct is anticompetitive.

"The federal antitrust laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." Brooke Group Ltd., 509 U.S. at 225.  The Supreme Court has cautioned against

> transform[ing] cases involving business behavior that is improper for various reasons . . . into treble-damages antitrust cases.  Although undoubtedly judges would create a kinder and gentler world of commerce, it is inappropriate to place the judicial thumb on the scale of business disputes in order to rebalance the risk from that assumed by the parties.

Intergraph Corp., 195 F.3d at 1364.

Similar to the Court in Verizon, this Court is asked to determine whether the allegations of the amended complaint (1) constitute conduct that is recognized as anticompetitive, or (2) provide a basis, under traditional antitrust principles for recognizing a new type of anticompetitive conduct.  Verizon, 540

U.S. at 410-11.  Considering the particular structure and circumstances of the cell phone industry, this Court determines that Qualcomm's alleged conduct has not been recognized as anticompetitive for purposes of the Sherman Act.  The Court declines the invitation to acknowledge the alleged conduct as a new type of anticompetitive conduct.  "The cost of false positives counsels against an undue expansion of § 2 liability." Verizon, 540 U.S. at 414.

**B.    Tying and Exclusive Dealing - Counts 3, 4, 5, and 6**

Counts 3 through 6 allege that Qualcomm has engaged in exclusive dealing and tying.  Broadcom alleges that "Qualcomm's refusal to offer discounts to its excessive patent royalty rates or patent licensing fees unless the purchaser also buys Qualcomm's UMTS chipsets . . . constitute[s] unlawful tying" in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.  (Am. Compl., at 48, 50.)  It also alleges that "Qualcomm's agreements with cell phone manufacturers - pursuant to which such companies agree to purchase Qualcomm's UMTS chipsets only, not to purchase competitors' chipsets or to do so only on terms that materially disadvantage such products" constitute unlawful exclusive dealing pursuant to Section 1 of the Sherman Act and Section 3 of the Clayton Act.  (Id. at 47, 49.)  Qualcomm seeks dismissal of all four counts.

1.   **Legal Standard**

i.   **Tying**

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."  15 U.S.C. § 1.  "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  Kodak, 504 U.S. at 461 (internal quotes and cites omitted).  Tying arrangements violate Section 1 of the Sherman Act if (1) the seller has "appreciable economic power" in the tying product market, and (2) the arrangement affects a substantial volume of commerce in the tied product market.  Id. at 462.  Tying arrangements may also violate Section 3 of the Clayton Act.  Section 3 provides that

> [i]t shall be unlawful . . . to make a lease or sale or
> contract for sale of goods . . . or other commodities .
> . . on the condition, agreement, or understanding that
> the lessee or purchaser thereof shall not use or deal in
> the goods . . . of a competitor . . . where the effect .
> . . may be to substantially lessen competition or tend to
> create a monopoly in any line of commerce.

15 U.S.C. § 14; see Town Sound & Custom Tops, Inc. v. Chrysler Motor Corp., 959 F.2d 468, 474 (3d Cir. 1992) (noting Section 3 of the Clayton Act technically covers exclusive dealing agreements, but that Congress also intended it to cover tying arrangements).

30

A plaintiff asserting a claim for an illegal tie-in must establish that (1) the defendant's conduct was a tie-in; "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product," (2) the seller "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product," and (3) not an insubstantial amount of commerce is affected.  SmithKline Corp., 575 F.2d at 1062. The agreement that forms the basis of the tie-in need not be a formal agreement, but the plaintiff must demonstrate in some way that there was a tie-in, not merely the sale of two products by a single seller.  Id.; see Ungar v. Dunkin Donuts of Am., 531 F.2d 1211, 1224 (3d Cir. 1976) (same); Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d 1403, 1407 (9th Cir. 1984) ("where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price").  This may be done by proof that the purchase of the tied product was involuntary or a result of coercion.  Ungar, 531 F.2d at 1224.

Implied by the elements of a tying claim is that the arrangement involves two distinct products.  Kodak, 504 U.S. at 462 (determining that camera repair service and the parts for camera repair were two different products for the purposes of an alleged tying arrangement).  The essential characteristic of an

31

illegal tying agreement is that the seller uses the control it has over the tying product to force buyers to purchase an unwanted product, or a product they would prefer to purchase elsewhere on different terms.  Id. at 465; see Ill. Tool Works Inc., 126 S.Ct. at 1286.

A firm enjoys "appreciable market power" when it has the power to force a purchaser to do something it would not do in a competitive market.  Kodak, 504 U.S. at 464.  Such power may be inferred from the seller's possession of a predominant share of the market.  Id.

### ii.  Exclusive Dealing

Exclusive dealing agreements, like tying arrangements, also may violate both Section 1 of the Sherman Act and Section 3 of the Clayton Act.  Exclusive dealing agreements require that a purchaser not deal in the goods of a competitor of the seller. Town Sound, 959 F.2d at 474 n.2.  An exclusive deal does not have to contain a specific agreement not to use the goods of a competitor to be considered exclusive.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 326 (1961).  It is enough that the practical effect of an agreement prevents the use of a competitor's product.  Id.  An exclusive dealing agreement violates the antitrust laws when the competition it forecloses is a substantial share of the relevant market.  Id. at 327; Barr Labs., Inc., 978 F.2d at 110.

32

##### 2.   **Application**

The Court determines that Qualcomm's alleged conduct does not amount to a tie or exclusive deal in violation of the Sherman and Clayton Acts.[5]   Counts 3 through 6, therefore, fail to state claims upon which relief can be granted and they will be dismissed.

The threshold requirement to state a tying or exclusive dealing claim is the existence of a forced sale, or an agreement not to use a competitor's goods that forecloses a substantial share of commerce.  Broadcom does not allege that Qualcomm refuses

---

[5] The Court, for the purposes of this opinion, will assume that Broadcom has sufficiently alleged that (1) Qualcomm has market power in the tying product, the WCDMA technology license, (2) there are separate products, the license and the chipset, and (3) the "arrangement" affects more than insubstantial amount of interstate commerce.  Kodak, 504 U.S. at 462.

The Court also recognizes that the Clayton Act is only applicable to exclusive deals or tying arrangements that involve goods or commodities.  See 15 U.S.C. § 14.  The Court determines that there is no exclusive deal or tie, therefore, the Court need not decide whether a patent license is a commodity for purposes of the Clayton Act.  The Court expresses no opinion as to the issue, but the Court notes that other courts have limited the definition of commodity to a tangible good.  See Ungar, 531 F.2d at 1215 n.4 (noting that the district court determined that a trademark and logo were not goods for the purposes of the Clayton Act, but declining to address that decision because the issue was not before the Circuit); Tele Atlas N.V. v. Navteq Corp., 397 F.Supp.2d 1184, 1193 (N.D. Cal. 2005) (dismissing tying claims brought pursuant to the Clayton Act because a patent license is not the sale of a tangible good); Satellite Assoc. v. Cont'l Cablevision of Va., Inc., 586 F.Supp. 973, 975 (E.D. Va. 1982) (determining that the Clayton Act does not encompass the sale of services because a commodity is some type of tangible property); La Salle St. Press Inc. v. McCormick & Henderson Inc., 293 F.Supp. 1004, 1006 (N.D. Ill. 1968) ("the sale of a patent license is the sale of [a] right or privilege . . . [a]s such it does not fall within the . . . family of tangible and movable chattels which is covered by the term 'commodity'").

to license its WCDMA technology without the purchase of Qualcomm
UMTS chipsets.  Rather, accepting the allegations stated in the
amended complaint as true, Qualcomm refuses to offer discounts or
other market incentives to potential licensees without the
purchase of Qualcomm chipsets.  The Court recognizes that a formal
tying agreement is not necessary to state a claim for unlawful
tying.  In the absence of such an agreement, however, there must
be indications of a forced sale or coercion.  See Ungar, 531 F.2d
at 1224 (stating that in the absence of a formal agreement, a
plaintiff must show the purchase of two products from a single
seller was not voluntary, i.e., by proof of coercion).

The requisite coercion here is lacking.  Broadcom argues
that Qualcomm's conduct (1) strongly discourages chipset buyers
from dealing with Qualcomm competitors, (2) makes meaningful
competition impossible, and (3) amounts to economic coercion.
(Pl. Br., at 29, 31.)  Qualcomm, however, has not conditioned the
availability of licenses to its patents on the purchase of UMTS
chipsets.  It has conditioned the availability of discounts and
incentives on the purchase of UMTS chipsets.  Licenses to
Qualcomm's patents and UMTS chipsets can be purchased separately.
Potential patent licensees are free to purchase chipsets from any
manufacturer.  See Jefferson Parish Hosp. Dist. No. 2. v. Hyde,
466 U.S. 2, 12 (1984) ("where the buyer is free to take either
product by itself there is no tying problem even though the

34

seller may also offer the two items as a unit at a single price"
(internal quotes and cites omitted)).

Qualcomm's decision to offer discounts to licensees who
purchase Qualcomm chipsets may make the purchase of Qualcomm
chipsets a more economically viable option for those licensees.
Such an incentive, however, does not amount to a forced sale.
See, e.g., Robert's Waikiki U-Drive, Inc., 732 F.3d at 1407
(plaintiff challenging program whereby consumers who flew on a
particular airline received a discounted rate on a rental car,
and the court rejecting the claim noting that it showed only the
existence of a lower price for two items bought as a package).
The freedom to choose to purchase chipsets from a Qualcomm
competitor, while perhaps "more prevalent in theory than in
operational reality, is enough to circumvent the tie-in
prohibitions of the relevant antitrust laws." SmithKline Corp.
v. Eli Lilly & Co., 428 F.Supp. 1089, 1114 (E.D. Pa. 1976)
(judgment aff'd by SmithKline v. Eli Lilly & Co., 575 F.2d 1056
(3d Cir. 1978)). "We understand the argument that proof of
acceptance of a burdensome or uneconomic offer of a secondary
(tied) product is some evidence of coercion." Ungar, 531 F.2d at
1225. Acceptance of such an offer, however, is not sufficient to
establish the coercion element of an illegal tie-in claim. Id.
"Establishing that buyers purchase products A and B from the
seller does not establish that the seller ties the sale of

product A to the purchase of product B.  It merely establishes that buyers purchase products A and B from the seller."  Id.

Similar to this action, the Third Circuit in SmithKline considered whether a program adopted by Eli Lilly, that provided hospitals with a rebate based on the total amount of cephalosporin drugs the hospital purchased from Eli Lilly, was an unlawful tie. SmithKline, 575 F.2d at 1061.  SmithKline, one of Eli Lilly's competitors, manufactured a cephalosporin similar to the cephalosporins included in the rebate program.  It argued that Eli Lilly's rebate program was an illegal tying scheme because to take advantage of the rebate, hospitals were forced to buy all cephalosporins from Eli Lilly.  Affirming the district court's determination that the rebate did not constitute an illegal tie, the Third Circuit noted that Eli Lilly did not condition the availability of its drugs on (1) the purchase of another drug, or (2) a purchasing hospital's refusal to deal with Eli Lilly's competitors.  The court determined that in the absence of such requirements, "Lilly's marketing scheme lacks the element of coercion necessary for liability under the theory of tie-ins." Id. at 1062; see also SmithKline Corp., 427 F.Supp. at 1113 ("[t]he court can find the existence of an illegal tie-in only if . . . Lilly refused to sell Keflin and/or Keflex separately"). Similarly, Qualcomm's practice of providing discounted patent royalty rates to licensees buying Qualcomm UMTS chipsets lacks

36

the coercion necessary to be considered an unlawful tie.  Such a practice may (1) "strongly discourage" the purchase of non-Qualcomm UMTS chipsets, and (2) make the purchase of Qualcomm chipsets more economically feasible, but such discouragement does not foreclose the ability to obtain a WCDMA patent license from Qualcomm without the purchase of a chipset.

Qualcomm's alleged conduct also does not amount to an unlawful exclusive dealing agreement.  The claim language itself parrots the definition of an exclusive dealing agreement; "Qualcomm's agreements with cell phone manufacturers - pursuant to which such companies agree to purchase Qualcomm's UMTS chipsets only, not to purchase competitors' chipsets . . . - unreasonably restrain competition and foreclose a substantial share of the UMTS chipset market."  (Am. Compl., at 47, 49.)  Considering the factual allegations of the amended complaint as a whole, however, the alleged exclusive deal is: Qualcomm provides potential Qualcomm patent licensees discounts, economic incentives, and other rewards if they do not use chipsets from a Qualcomm competitor.  (See id. at 6, 31-33, 36.)  Broadcom indicates that the effect of such practices is to "strongly discourage" chipset buyers from dealing with Qualcomm's competitors.  (Id. at 36.)

Similar to the alleged tying arrangement, the alleged exclusive deal does not require that patent licensees only purchase Qualcomm chipsets.  The "deal" provides incentives for

37

those patent licensees choosing to purchase Qualcomm chipsets. The practical effect may be to make the purchase of Qualcomm chipsets more financially viable; however, it does not foreclose the purchase of another company's chipset.  That the discounts offered by Qualcomm "substantially raise competitors' costs of selling and marketing UMTS chipsets" does not give rise to antitrust liability.  The antitrust laws are not intended to place competitors on equal footing in the market; they are intended to address conduct that forecloses competition and unreasonably restrains trade.  See Intergraph Corp., 195 F.3d at 1360 ("the purpose of the antitrust laws is to foster competition in the public interest, not to protect others from competition, in their private interest").

The Court recognizes that an exclusive deal need not be a formal agreement. Such an arrangement, however, must foreclose a substantial portion of the market.  Even assuming Qualcomm's conduct would amount to an exclusive deal, the pleadings are deficient.  Absent from the amended complaint are allegations as to how a substantial portion of the market is foreclosed.  It generally asserts that Qualcomm competitors or chipset buyers have been disadvantaged by Qualcomm's "deal," but does not provide any details as to the market, including (1) what other companies manufacture and sell UMTS chipsets, (2) market shares of the relevant sellers, and (3) how sales have been affected or

foreclosed by Qualcomm's "deal."  (See Am. Compl., at 36, 47.)
The amended complaint permits the inference that several
companies manufacture UMTS chipsets.  But without any further
details, the Court is unable to conclude that the alleged deal
forecloses competition, and therefore, gives rise to a cause of
action under the antitrust laws.

The facts and claims alleged by Broadcom do not state claims
for unlawful tying or exclusive dealing.  Qualcomm's dual status
as a patent-holder for WCDMA technology, and manufacturer of UMTS
chipsets provide it with a business advantage.  The need for
others to obtain licenses to Qualcomm's patents is a consequence
of the standard-setting process.  The market accepts such
consequences because of the need for interoperability.  Broadcom
invites the Court to extend claims for unlawful tying and
exclusive dealing to include coercion in the form of rebates,
discounts, and other incentives.  The Court declines this
invitation.  The Court recognizes the potential for the provision
of economic incentives and inducements to draw antitrust scrutiny
in another fact pattern.  The "coercion" as alleged here,
however, does not merit such an extension.  Counts 3, 4, 5, and 6
of the amended complaint, therefore, will be dismissed.

## C.    Flarion Acquisition - Count 8

Count 8 of the amended complaint asserts that Qualcomm's
acquisition, holding, and use of Flarion and its assets violate

Section 7 of the Clayton Act.  (Am. Compl., at 52.)  Broadcom
requests that the Court enjoin Qualcomm's acquisition of Flarion
pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  (Id.
at 58.)  Qualcomm argues that this claim should be dismissed
because Broadcom does not have standing to assert such a claim.
(Def. Br., at 41.)  Broadcom argues that it has standing because
it has alleged that the acquisition threatens antitrust injury to
it, and the threat of injury is sufficient to bring a claim
pursuant to Section 16.  (Pl. Br., at 40.)

### 1.   Relevant Facts

Qualcomm announced its plan to acquire Flarion on August 11,
2005.  (Am. Compl., at 38.)  Flarion is "a pioneer and leading
developer" of OFDM/OFDMA technologies and a key holder of patents
for this technology.  (Id. at 8, 39.)  OFDM/OFDMA technologies
are expected to be a foundation for the generation of cell phone
technology beyond 3G.  (Id.)  This emergent generation is referred
to as B3G and 4G.  (Id. at 9.)  "While the B3G standards are not
yet fully developed, it is clear that Qualcomm-owned and Flarion-
owned technologies will be leading contenders for adoption in the
B3G mobile wireless systems and for 4G systems after that."  (Id.
at 17.)  Products embodying the B3G technologies "may not arrive
in the marketplace for three or more years," but "the process of
adopting industry standards for these technologies is well

40

underway, with 4G technology standards expected to follow closely." (Id. at 39.)

Broadcom alleges that Qualcomm perceives Flarion as a competitor in the B3G technology market. (Id.)  It alleges that Qualcomm's goal in acquiring Flarion is to gain control over Flarion's portfolio of patents.  Flarion's patents are likely to compete with Qualcomm's patents to become essential to B3G and 4G standards. (Id. at 42.)  Following the acquisition, Qualcomm would have control over both leading candidates for the B3G and 4G standards.  Qualcomm already controls the CDMA and WCDMA technology.  With Flarion's patents, it would be ensured control of the OFDM/OFDMA technology patents. (Id.)

Broadcom asserts that it is a customer in the B3G and 4G technology markets, and it "may require a license to intellectual property necessary to manufacture B3G and 4G equipment." (Id. at 44.)  Broadcom also "expects to be a competitor in the chipset markets for B3G and 4G technologies." (Id.)

### 2. Legal Standard

Section 7 of the Clayton Act provides:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of

> the assets of another person engaged also in commerce or
> in any activity affecting commerce, where in any line of
> commerce or in any activity affecting commerce in any
> section of the country, the effect of such acquisition
> may be substantially to lessen competition, or to tend to
> create a monopoly

15 U.S.C § 18.  To obtain relief, a private plaintiff seeking an injunction pursuant to Section 16 of the Clayton Act to remedy a violation of Section 7 must show a threat of antitrust injury. Alberta Gas Chems. Ltd. v. E.I. DuPont de Nemours & Co., 826 F.2d 1235, 1240 (3d Cir. 1987).  An antitrust injury is injury (1) of the type the antitrust laws were designed to prevent, and (2) that flows from that which makes the defendant's acts unlawful.  Id.; see Cargill Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 113 (1986) (noting that plaintiffs seeking injunctive relief pursuant to Section 16 must allege threatened loss or damages of the type the antitrust laws were designed to prevent); City of Pittsburgh, 147 F.3d at 264 ("when seeking injunctive relief, the complainant need only demonstrate a significant threat of injury from an impending violation of the antitrust laws" (internal quotes and cite omitted)).  "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (noting that antitrust injury must be caused by the antitrust violation not merely causally linked to an illegal presence in the market).

The threat of a loss of profits or damages due to increased competition does not constitute an antitrust injury.  Cargill, 479 U.S. at 495.  "The antitrust laws [] were enacted for the protection of competition, not competitors."  Brunswick, 429 U.S. at 488 (internal quotes and cites omitted).  Damages or injuries that are speculative and may never occur also do not permit the award of injunctive relief.  City of Pittsburgh, 147 F.3d at 269 (affirming district court's order dismissing complaint seeking to enjoin the proposed merger of two utilities because the alleged threatened antitrust injury was too speculative); see also Ideal Dairy Farms Inc. v. John Labatt, Ltd., 90 F.3d 737, 750 (3d Cir. 1996) (conclusory assertions of harm or injury alone do not support a Clayton Act claim).  When a plaintiff fails to show a threat of antitrust injury, the Court need not consider whether the proposed merger violates Section 7.  Cargill, 479 U.S. at 122.  "Section 16 authorizes the prevention of the consequences of an antitrust violation; it does not create the violation." Intergraph Corp., 195 F.3d at 1360.

### 3.  Application

Broadcom alleges that the proposed merger of Qualcomm and Flarion will substantially lessen competition, and tend to create a monopoly in the markets for B3G and 4G technology.  (Am. Compl., at 52.)  It asserts that the merger will reduce Broadcom's ability to obtain B3G and 4G technology licenses on competitive terms,

43

and increase Qualcomm's market power enabling it to "continue its unlawful conduct to undermine or exclude competitors . . . from the markets for B3G and 4G chipsets."  (Id. at 44.)

The potential injuries Broadcom would endure as a result of Qualcomm's acquisition of Flarion do not allege sufficient antitrust injury to maintain Count 8 of the amended complaint. Broadcom's alleged injuries, such as those injuries alleged in City of Pittsburgh, are too speculative.  The injury may not occur, and if it did, the degree would be difficult to measure. Broadcom alleges that Qualcomm's previous acquisitions and conduct in the 2G and 3G technology, and chipset markets have substantially lessened competition in those markets, therefore, the Flarion acquisition will have the same result in the B3G and 4G markets.  (See Am. Compl., at 52.)  Looking to acquire new technology is accepted competitive behavior.  Qualcomm's acquisition of Flarion will provide it with increased potential and resources to compete in an emerging market.  The experience in the 2G and 3G markets provide historical context to the Flarion acquisition, however, it does not make Broadcom's threatened injury in the B3G and 4G markets more imminent or concrete.  Despite the similarities, the Flarion acquisition by Broadcom's own assertion, deals with different markets.  (Id. at 20.)  Cf. Intergraph Corp., 195 F.3d at 1360 (discussing whether plaintiff violated the Sherman Act and noting that "[t]he specter

44

of [the defendant's] resources and talent is not evidence of
future Sherman Act violation").

Products embodying the B3G and 4G technology are not yet on
the market, and may not arrive in the marketplace for three more
years.  (Am. Compl., at 39.)  See City of Pittsburgh, 147 F.3d at
268 (finding that the plaintiff's alleged antitrust injury was
speculative because it was difficult to measure, and possible
that the claimed injury would not occur).  No industry standard
for either generation has been adopted.  Flarion's technology,
according to Broadcom, is considered the front-runner for the new
technology standard, but competing technology does exist.
Broadcom "may require" a B3G or 4G technology license, and
"expects to be a competitor" in the chipset markets for those
technologies.  (Am. Compl., at 44.)  For Broadcom to be injured,
therefore, several events would have to take place.  Broadcom
would be injured if (1) a B3G or 4G technology standard is
adopted, (2) the B3G or 4G standard that is adopted incorporates
patented technology, (3) the patented technology incorporated
into the standard is owned by Flarion, (4) Flarion owned the
technology incorporated into the standard before it was acquired
by Qualcomm, (5) Broadcom seeks to manufacture chipsets based on
B3G or 4G technology, (6) Broadcom needs a license to Qualcomm's
patents, and (7) Qualcomm does not license the patents "on
competitive terms."  (See id.)  Considering all these "ifs"

45

together, the Court determines that the threat of antitrust injury posed by the Flarion acquisition is too remote to maintain Count 8 of the amended complaint.[6]

**D.   The Remaining State Law and Common Law Claims**

The Court has jurisdiction over Broadcom's state law and common law claims pursuant to 28 U.S.C. § 1367(a) which provides: "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  A district court, however, may decline to exercise supplemental jurisdiction over such claims when it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); see Figueroa v.

---

[6] The Court dismisses this claim based on the determination that Broadcom does not allege an antitrust injury sufficient to state a Section 7 claim, not based on a determination that Broadcom does not have standing.  Qualcomm, in its brief, argues Broadcom does not have standing to assert a Section 7 claim because it has not alleged an antitrust injury.  (Def. Br., at 41.)  The Court recognizes that "the questions of antitrust injury and antitrust standing are difficult to disentangle." City of Pittsburgh, 147 F.3d at 265 n.15.  "However in the sense that plaintiffs who sustain no antitrust injury may not recover, they may be loosely said to lack standing." Alberta, 826 F.2d at 1240.  The Court, here, determines that Broadcom has not alleged sufficient antitrust injury.  The Court, therefore, makes no determination as to Broadcom's standing.  See Verizon, 540 U.S. at 416 n.5 (dismissing the complaint because the defendant's conduct was not anticompetitive for purposes of the Sherman Act, and noting "[o]ur disposition makes it unnecessary to consider petitioner's alternative contention that respondent lacks antitrust standing"); Alberta, 826 F.2d at 1240 (noting that once antitrust injury is demonstrated, standing analysis is employed).

Buccaneer Hotel, Inc., 188 F.3d 172, 181 (3d Cir. 1999) (affirming dismissal of remaining claims based on Section 1367(c)(3) because federal claim had been dismissed).

The Court has disposed of the federal antitrust claims that provide the Court with subject matter jurisdiction.  The Court declines to exercise supplemental jurisdiction over the remaining state and common law claims.  28 U.S.C. § 1367(c)(3).  The state and common law claims, therefore, will be dismissed without prejudice, and the statute of limitations for plaintiff to bring such claims in state court will be tolled for thirty days after the date of this dismissal.  28 U.S.C. § 1367(d).

## CONCLUSION

The Court, for the reasons stated supra, will grant the defendant's motion to dismiss the amended complaint.  An appropriate order and judgment will be issued.

                        s/ Mary L. Cooper
                        **MARY L. COOPER**
                        United States District Judge

47